KYLE A. KINNEY, ESQ. [BAR NO. 027189]
LAW OFFICES OF KYLE A. KINNEY, PLLC
1717 N. 77TH STREET, SUITE 6
SCOTTSDALE, AZ 85257
PHONE: [480]269-7077
FAX: [480] 614-9414
EMAIL: KYLE@KINNEYLAW.NET

ATTORNEY FOR DEBTORS;
RONALD AND ARLENE SILVER

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| In Re: | Chapter 11 |
|---|---|
| **RONALD AND ARLENE SILVER,,** | **Case No. 2:17-bk-07624-SHG** |
| **Debtor.** | |

**DEBTORS' DISCLOSURE STATEMENT FOR FIRST AMENDED PLAN OF REORGANIZATION DATED JUNE 8, 2018**

## I.  INTRODUCTION

Ronald and Arlene Silver, Debtors and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case ("Silvers" or "Debtor") hereby submit to the Court and creditors of the Debtors' estate, the following Debtors' Disclosure Statement for Plan of Reorganization dated April 9, 2018 (the "Disclosure Statement").  This Disclosure Statement is submitted pursuant to 11 U.S.C. § 1125.

11 U.S.C. § 1125(b) prohibits the solicitation of acceptances or rejections of a Plan of Reorganization unless such Plan is accompanied by a copy of the Disclosure Statement which has been approved by the Bankruptcy Court.

The purpose of this Disclosure Statement is to provide creditors and interested parties in these bankruptcy proceedings with such information as may reasonably be deemed sufficient to allow creditors and interested parties to make an informed decision regarding the Debtors' First Amended Plan of Reorganization dated June 8, 2018 (the "Plan").

Unless otherwise noted, those portions of the Plan and this Disclosure Statement

1

providing factual information concerning the Debtors, their assets and liabilities, have been prepared from information submitted by the Debtors and their retained professionals. The Debtors and other professionals employed by the Debtors have utilized all relevant, non-privileged information provided by the Debtors in preparing this Disclosure Statement and the Plan.

This Disclosure Statement contains information that may influence your decision to accept or reject the Debtors' proposed Plan. Please read this document with care.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant. For that reason, the Debtorsare not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy. To the extent practicable, the information has been prepared from the Debtors' financial books and records and great effort by an independent certified public accountant, Joel Ruben, was utilized to ensure that all such information is fairly represented.

This Disclosure Statement and the Plan will classify all creditors into Classes. The treatment of each Class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the Class to which your Claim will be assigned.

This Disclosure Statement requires approval by the Bankruptcy Court after notice and a hearing pursuant to 11 U.S.C. § 1125(b). Once approved, the Disclosure Statement will be distributed with the Debtors' proposed Plan for voting. Approval of the Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Debtors' Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy.

The Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are satisfied. The Bankruptcy Court must determine whether the Plan has been accepted by each impaired Class entitled to vote on the Plan. Impaired Classes entitled to vote on the Plan are those Classes of claims whose legal, equitable, or contractual rights are altered, as defined under Section 1124 of the Bankruptcy Code. An impaired Class of

claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount of those claims who vote and more than one-half (1/2) in number of those claims who vote have accepted the Plan. An impaired Class of interests is deemed to have accepted the Plan if the Plan has been accepted by at least two-thirds (2/3) in amount of the allowed interests who vote on the Plan.

Even if each Class of creditors does not accept the Plan, the Plan can be confirmed under Section 1129(b) of the Bankruptcy Code, so long as one impaired Class of creditors accepts the Plan. This is referred to as the "cram down" provision of the Bankruptcy Code. The failure of each Class to accept the Plan could very well result in a conversion of this case to Chapter 7 or dismissal of the Chapter 11.

Only the votes of those creditors or interested parties whose ballots are timely received will be counted in determining whether a Class has accepted the Plan.

## II.    DEFINITIONS

The definitions set forth in Article I of the Plan apply in this Disclosure Statement except to the extent other definitions are set forth in this Disclosure Statement.

## III.    THE DEBTORS, BACKGROUND, AND EVENTS PRECIPITATING THE CHAPTER 11

### A.    <u>Background</u>

1.    Debtor, the Silvers, are a married couple and senior citizens. The Debtors own a commercial building within a strip mall located at 2701 W. Glendale Ave., Phoenix, AZ 85051 (the "Glendale Building"). It is the principal asset of the Estate. It is an approximately twelve thousand one hundred and fifty-five (12,155) square foot corner building located at the intersection of Glendale Avenue and 27th Avenue. As of this date, two tenants occupy the building with the two leases covering eight thousand one hundred and fifty-five (8,155) square feet and one thousand three hundred and thirty-three (1,333) square feet, respectively, rendering the Glendale Building 78% leased and occupied. Approximately two thousand six hundred and sixty-seven (2,667) remain unoccupied. The unoccupied space is an end cap that can be leased to one retail tenant or divided in half and leased to two retail

tenants. Two leases of $13,132.69 and $1,943.18 produce approximately $15,078 per month in rental income less mortgage payments of $8,932.86. It is believed that the fair market rental value of the vacant 2,667 square feet is $3,778.25 per month.

The Glendale Building is encumbered by a first position deed of trust that secures an interest only promissory note with a balloon payment due May 1, 2022 in the amount of approximately $1,151,926.50 with Ocwen Loan Servicing ("Ocwen") acting as loan servicer. The fair market value ("FMV") of the Glendale Building is believed to be approximately $1,600,000 based upon an offer received prior to the Petition Date. However, based upon shoddy tax advice received from a prior certified public accountant ("CPA"), the Silvers took substantial depreciation on their tax returns on the Glendale Building and, if sold, would owe in excess of $500,000 in tax liabilities thus rendering the Glendale Building "underwater" for liquidation purposes. The tax liability is split evenly between the Silvers and, according to their current CPA, if either one of the Silvers were to pass away then ½ of the tax liability associated with the Glendale Building would vanish and render the Glendale Building "above water" thus affording the Silver(s) with an ability to liquidate the Glendale Building, pay off the Glendale Building's sole secured creditor in full, and have sufficient savings to survive what is left of the golden years.

2. The Debtors own one other commercial building, three residential investment condos, and a residential home which serves as their primary residence. These are described as follows:

(a) The Hatcher Building. A commercial building located at 503-509 W. Hatcher Rd., Phoenix, AZ 85021 (the "Hatcher Building"). It is approximately three thousand four hundred (3,400) square feet. As of this date, the Hatcher Building is 100% leased and occupied and the Hatcher Building almost "pays for itself" meaning that the Silvers realize a small loss on the Hatcher Building. Capital One Bank ("Capital One") is the loan servicer for secured creditor Greenpoint Mortgage Funding, Inc. for the Hatcher Building. Monthly rent is approximately $2,430 and the monthly mortgage payment is approximately $2,522. The amount owed to Capital One is approximately $265,000 and the FMV is believed

to be as high as $315,000 as of this date. When factoring in expected brokerage fees of 6%, closing costs, tax consequences and necessary repairs to obtain FMV, a sale of the Hatcher Building is believed to be about "break even" transaction for the Silvers. The Silvers will liquidate the Hatcher Building on or around the Effective Date (dependant on the Silvers receiving a suitable offer) so that they may pay the Hatcher Building's sole secured creditor, in full, and eliminate the burdensome work associated with acting as property manager for this building without profit.

(b) The Acoma Condos. Three residential condos located at 7009 E. Acoma Dr., Scottsdale, AZ 85254, units 1040, 1052 and 2093 (collectively, the "Acoma Condos" and each individually referred to as "Unit 1040", "Unit 1052" and "Unit 2093" respectively). The Acoma Condos are each in the same complex with the same floor plan consisting of approximately seven hundred (700) square feet each. As of this date, two of the Acoma Condos are fully leased and occupied. A tenant was evicted in approximately January, 2018 from Unit 1040 for failure to pay rent. The Court has approved the sale of Unit 1040 (the unoccupied Acoma Condo) which will provide funding for the effectuation of the Plan with an expected close of escrow date on or about June 16, 2018. The Silvers will liquidate the other two Acoma Condos as each respective lease expires during the summer of 2018. As of the Petition Date, the Acoma Condos were believed to not have any equity, however, as the Silvers have made monthly mortgage payments and as the real estate market has changed, the Silvers Believe that each condo holds approximately $30-40,000 of equity after accounting for brokerage commissions, other closing costs and tax liability.

Unit 1040. Approximately $136,931.07 is owed and secured by a deed of trust and the Court approved a sale for $187,000.00. Fair market rental value is believed to be as high as $1,300. The Silvers owe 5.5% of the sales price in brokers' commissions, plus closing costs, and may have to contribute some additional funds (not believed to be greater than $3,000) for the purposes of making repairs after the buyers obtain their home inspection prior to the close of escrow.

Unit 1052. Approximately $136,573.35 is owed and secured by a deed of trust and FMV is believed to be as in the range of $180,000 - $190,000. The unit is currently leased for $945.00 and the monthly mortgage payment is $904.39. Liquidation expenses of Unit 1052 will be nearly identical to the liquidation expenses of Unit 1040.

Unit 2093. Approximately $136,573.35 is owed and secured by a deed of trust and FMV is believed to be in the range of $170,000 - $180,000. Unit 2093 is believed to be of lesser value than Units 1040 and 1052 because it is on the second level and a buyer must use a stairwell to gain access. The monthly mortgage payment is $893.13 and the Unit is currently leased for $950.00 per month. Liquidation expenses of Unit 2093 will be nearly identical to the liquidation expenses of Unit 1040 with the primary difference being lower commissions owed to real estate brokers due to the anticipated lower sales price.

(c)     The Charter Oak Home. A residential home located at 8329 E. Charter Oak Rd., Scottsdale, AZ 85260 ("Charter Oak Home"). The Charter Oak Home is and has been the Silvers' primary residence for over 30 years. Thus, the Charter Oak Home is not leased, but is 100% occupied by the Silvers. The Charter Oak home does not have any equity (or minimal equity) when factoring in real estate commission fees and other liquidation expenses. The Silvers received a loan modification from the sole secured creditor on May 1, 2017 extending the note maturity date to January 1, 2047 with monthly installment payments of $3,497.71. The Silvers do not expect to live through the maturity date and thus view the monthly installment payments as "rent" payments. The Silvers believe that they can lease a property to live in for far less and preserve financial resources, therefore the Silvers will liquidate Charter Oak. The Silvers will use the sales price to pay the sole secured creditor, in full. In the event that the sales price is insufficient to satisfy the amount owed to the secured creditor, the Silvers will first pursue approval for a "short sale", and if they are unable to obtain approval, the Silvers will allow the secured creditor to enforce its non-judicial foreclosure rights as the Silvers are protected from any deficiency balance that might be owed pursuant to A.R.S. § 33-814.

3.     In addition to property rentals, the Silvers receive modest Social Security income and Ronald Silver works part time at Home Depot which pays him approximately $1,500 per month.

**B.     Events Leading to Chapter 11**

1.     Over the period of approximately 30 years the Silvers slowly acquired the above referenced properties.  The Silvers managed to be successful investment property owners and survived the recent economic recession of 2008 which provided the worst economic conditions that the United States, and specifically the Arizona real estate market, has seen since the Great Depression.  Unfortunately, during the real estate "boom" leading up to the recession, the Silvers acquired the Acoma Condos for inflated "bubble" prices and refinanced the Glendale Building and Charter Oak Home thus reducing almost all, if not all, of their equity once real estate prices came back to normal levels with the bubble burst.  While the Silvers managed to survive the recession, they lost significant equity and savings thus putting them in a "month to month" economic position where they relied upon rents received to meet their monthly financial obligations with the most significant rental income coming from the Glendale Building.

2.     The Silvers had a long-time tenant, O'Reilly Automotive, in the Glendale Building for over 20 years.  The tenant was reliable.  O'Reilly moved out in approximately 2016 and the Silvers found a new tenant.  Unfortunately, the new tenant vandalized the Glendale Building by making unauthorized alterations without the required permits (many of them not completed) and then moved out of the Glendale Building without paying.  While vacant, the Glendale Building was further vandalized by unknown parties. The Silvers have since recovered any have two tenants occupying the Glendale Building, paying approximately $13,132.69 and $1,943.18, respectively.

3.     In the period between O'Reilly's move-out and the Silvers finding paying tenants they became unable to afford all of their mortgage payments and fell behind on their mortgages for the Glendale Building and the Charter Oak Home.  The Silvers applied for and were approved for a loan modification for the Charter Oak Home on approximately

7

February 22, 2017.  The Silvers made attempts to catch up with missed payments for the Glendale Building but could not keep up with penalties and interest that were accruing.  The Silvers then applied for mortgage assistance on the Glendale Building but were declined and were noticed with a trustee's sale set for July, 2017.  The Silvers then filed this Chapter 11 case.

## IV    BUSINESS PLAN AND PROJECTIONS

As set forth above, the Glendale Building is the sole source of meaningful income and is essential to rehabilitation and is the sole source of the Debtors retirement funds except for modest social security checks.  Debtors will pursue a three-pronged business strategy with regard to the Properties to fund the plan, including: First, the utilization of the two triple-net leases from Glendale Building (currently $15,078), plus market and lease the vacant space for approximately $3,778.25, which would yield a projected monthly revenue stream of approximately $18,800.

Second, the Debtors will liquidate the Acoma Condos, the Hatcher Building, and Charter Oak.  The Acoma Condos will provide approximately $100,000 of equity and the Hatcher Building and Charter Oak will be close to "break even" value or provide minimal equity.

Third, the Debtors will either sell or refinance the Glendale Building by May 1, 2022 to satisfy their balloon payment obligations to Ocwen as loan servicer for secured creditor U.S. Bank, N.A.  In the event that one or both of the Silvers pass before that date then the tax implications caused by a sale of the Glendale building will either be cut in half *or* eliminated thus making a sale of the Glendale Building feasible prior to May 1, 2022.  Alternatively, if the Silvers' credit is sufficiently rehabilitated to allow them to qualify for a refinance loan prior to May 1, 2022, the Silvers will refinance the Glendale Building thus satisfying the balloon payment owed to Ocwen.  In the interim, the Debtors will pay the pre-petition arrearages of approximately $53,000 to Ocwen through the sale of the Acoma Condos and will satisfy the full pre-petition arrearage balance at a date not later than 30 days from the sale of the third and final Acoma Condo.

The Debtors plan on paying U.S. Bank National Association, as Trustee for Lehman Brothers Small balance Commercial Mortgage Pass-Through Certificates, Series 2007-3 ("US Bank"), for the Glendale Building, in full on its allowed secured claim with interest over the life of the plan but in any event no later than May 1, 2022.

The Debtors will continue all post-petition monthly installment payments to all secured creditors. Debtors will pay the full allowed secured claims for the sole lien holders on Charter Oak, the Acoma Condos, and the Hatcher Building through sale of these assets. Debtors will immediately market and list these properties for sale upon the Effective Date (or sooner).

The Debtors plan on paying the Arizona Department of Revenue("AZDOR") in full on its allowed priority claim of $938.35 within 30 days of the Effective Date as more fully described below. Any additional taxes that may be owed on account of post-petition claims will be paid as accrued by Debtors. The remaining $80.02 general unsecured claim of AZDOR will be paid pro-rata with the rest of the unsecured creditors as more fully described below.

The Debtors plan on paying Rein & Grossoehme Commercial Real Estate, LLC ("RGCRE") its allowed priority claim of $12,850 in equal monthly installments of $2,141.67 for six months beginning 30 days from the Effective Date. The remaining general unsecured claim of RGCRE in the amount of $15,904.89 will be paid pro-rata with the rest of the unsecured creditors as more fully described below.

As more thoroughly described below, the Debtors plan to pay the unsecured creditors in full over the life of the plan as more fully described below.

**A.** **Present Conditions, Operations and Future Management**

The present condition of the Debtors thus far has been to pay all of their post-petition payments to their secured creditors and all necessary expenses through rents received from their tenants.[1] In order to provide for efficient and productive operations, and to keep the

---

[1] Ocwen, as loan servicer for the secured creditor on the Glendale Building, has rejected monthly payments after accepting multiple post-petition monthly payments and now

Debtor's business competitive, the Debtors intend to retain the same management and structure that existed pre-petition, in the current interest holder. Debtor Arlene Silver has over 20 years' experience as a real estate professional and is intimately familiar with the Glendale Property. She will continue to act as property manager. Given Arlene Silver's old age, she will receive assistance from her son, Scott Silver, for issues such as repairs that she is no longer able to perform.

By maintaining its current management and operational structure, the Debtors will avoid the transactional costs associated with significant and unnecessary change. In addition, the institutional knowledge of the management will be preserved.

## B. Accounts Receivable and Outstanding Collateral

To the extent that an entity or custodian took possession or control of property of the estate during the case or with knowledge of the case, such transfer may be recoverable by the bankruptcy estate for the benefit of the estate under Sections 542 and 543 of the Bankruptcy Code. To date, no custodian has property belonging to the estate. Debtor's sole assets are the above referenced properties. Likewise, there are no outstanding accounts receivable owed to the Debtor.[2]

## C. Preferences and Fraudulent Conveyances

To the extent that a preference or fraudulent conveyance occurred before the bankruptcy filing, such transfer may be recoverable by the bankruptcy estate for the benefit of the estate under Sections 544, 547, or 548 of the Bankruptcy Code. To date, no complaints have been filed under any of these theories and no creditor extended credit to the Debtors prior to commencement of the case. To the extent any such claims exist, they will be analyzed for their potential value to the estate. These potential claims are specifically preserved for the benefit of the respective bankruptcy estates. Any recovery that is obtained will be obtained for the benefit of the estate.

_____

claims that Debtors are in arrears despite Debtors best efforts to reach an agreement with Ocwen. Debtors have these "missed" payments available.

[2] After evicting the tenant from Unit 1040, the tenant paid past due rent to prevent a judgment from issuing.

**D. Existence, Likelihood and Possibility of Success of Non-Bankruptcy Litigation**

The Debtors are not currently (and were not pre-petition) involved in any non-bankruptcy litigation. The total value of Debtors' real property assets is sufficient to pay-off their creditors, and the only creditor who was threatening a collection action pre-petition was the secured creditor of the Glendale Building who had noticed a trustee's sale. Debtors dispute many late charges and other penalties imposed upon them by this secured creditor, however, given that the Debtors lack liquid assets to finance a litigation against the secured creditor, the Debtors' possibility of success would be virtually non-existent.

**E. Liquidation Analysis**

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis (the "Notes").

The Liquidation Analysis estimates potential Cash distributions to Holders of Allowed Claims and Interests in a hypothetical Chapter 7 liquidation of the Debtor's assets. Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on a review of Claims listed on the Debtors' Schedules and Proofs of Claim Filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a Chapter 7 liquidation,

including Administrative Claims, wind-down costs, trustee fees, tax liabilities, and certain lease and contract rejection damages Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. For purposes of the Liquidation Analysis, the Debtors' estimate of Allowed Claims contained in the Liquidation Analysis references specific Claims presently filed in this matter. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Case to Chapter 7 liquidation, as of the estimated effective date of the Chapter 11 Plan, which is estimated at August 9, 2018 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a Chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estate.

### Primary Assets of the Debtors

The Liquidation Analysis assumes a liquidation of all of the Debtors' assets. The Debtors have four liquidateable assets. The Charter Oak Home is not liquidate-able through a Chapter 7 because it is their primary residence and equity does not exceed the statutory homestead exemption of $150,000. The Glendale Building is not liquidate-able and would have to be abandoned because the tax exposure exceeds the equity in the property.

The Debtor's four liquidate-able assets are the: i) Hatcher Building; and, ii-iv) Acoma Condos. The Hatcher building is believed to be worth $315,000 with approximately

$50,000.00 of equity *before* expected real estate commissions ($18,900), closing costs ($1,500) and other repair expenses ($3,000) believed to be $23,400.

The Acoma Condos are all believed to be worth approximately $180,000 with approximately $44,000 of equity, a piece, *before* expected respective real estate commissions ($10,800), closing costs ($1,500) and repairs ($3,000) of $15,300, or a total of $28,700 each.

There are no other material saleable assets, and, as such, no value is attributed to them in the Liquidation Analysis. The Liquidation Analysis does not attribute any value to the Debtors' intangible assets as none are believed to exist.

**Liquidation of Assets**

The Liquidation Analysis assumes that the Trustee would make a finding that the Hatcher Building and the Acoma Condos each have one (1) secured creditor, respectively.

**Liquidation Analysis Waterfall and Recovery Ranges**

The Liquidation Analysis assumes that there would be no new leases in the Acoma Condos, that the Hatcher Building would be sold subject to existing leases, and that these assets would be priced to sell quickly in a summertime market as opposed to the Chapter 7 Trustee coming out of pocket to pay post-petition installment payments while awaiting top of the market offers, and further assumes that Unit 1040 will not close on or around June 16, 2018 as expected, but instead on or after the Conversion Date. The Trustee would have proceeds in excess of the total unsecured claims of $55,363.59 (after brokerage fees, closing costs, and other sale expenses) and additional Trustee fees of 10%, or $5,536.36 (the "Liquidation Costs"), and such additional Administrative and Priority Claims that are estimated to be incurred in a Chapter 7 liquidation. Prior to additional Administrative and Priority Claims, net Liquidation Proceeds would equal $141,753.64, to be allocated to Creditors and Interest Holders in accordance with the priorities set forth in section 726 of the Bankruptcy Code.

13

# DEBTORS' LIQUIDATION ANALYSIS

|  |  | Value | Claim Amt. | Recovery |
|---|---|---|---|---|
| 1 | **The Building Value** | $ 710,000.00 | | |
| | a.   Unit 1040 | | | |
| | b.   Unit 1052 | | | |
| | c.   Unit 2093 | | | |
| | d.   Hatcher Building | | | |
| 2 | **Cash and Equivalents**[3] | $ 16,987.73 | | 0% |
| | **Gross Liquidation Proceeds Available for Distribution** | **$ 726,987.73** | | |
| 3. | **Priority Claims** | | | |
| | a.   Wage Claims | | | |
| 4. | **Priority Tax Claims** | | | |
| | a.   Arizona Department of Revenue | | | |
| 5. | Liquidation Costs | | | |
| | a.   Winding Down Fees | -0- | | |
| | b.   Trustee Fees | | | |
| 6. | **Claims** | | | |
| | a.   Administrative Claims | | | |
| | b.   DIP Claims | | | |
| | c.   1st Lieholder Debt | | | |
| |     i.   Unit 1040 | | | |
| |     ii.   Unit 1052 | | | |
| |     iii.   Unit 2093 | | | |
| |     iv.   Hatcher Building | | | |
| 9. | **Proceeds Available to Admin and Priority Claims** | | | |
| 10. | **Total Unsecured Claims** | | | |
| |    Sub Total | | | |
| | **Net Liquidation Proceeds Available to Secured** | | | |
| 12 | | | | |
| 13. | **Interests** | | | |
| 11 | Interests | | | 0% |

---

[3] Amount held in DIP Account is subordinate to Assignment of Rent clause for the respective secured creditors.

**Specific Notes to the Asset and Liability Assumptions Contained in the Liquidation Analysis:**

The Liquidation Analysis refers to certain categories of assets and liabilities. The numerical designation below corresponds to each line item with a specific note.

### The Hatcher Building and Acoma Condos' Value

The Liquidation Analysis assumes that the Trustee will price the Hatcher Building and Acoma Condos to sell quickly, and not to extract top of the market value at risk of carrying cost exposure. As stated above, it is assumed that the trustee would not attempt to sell the Charter Oak Home due to the homestead exemption (and because there is minimal to no equity) and will abandon the Glendale Building because of the corresponding tax liabilities.

### Cash and Equivalents

Cash consists of cash balances as of June 9, 2018, including: (a) unrestricted cash in any of the Debtor's bank, operating, and reserve accounts; (b) restricted cash in any of the Debtor's bank, operating and reserve accounts. Generally, the Liquidation Analysis assumes that the Trustee assumes and assigns contracts related to the lease agreement with the tenants, and further assumes and assigns individual cash flow positive for value; thus, the Liquidation Analysis assumes that the Trustee will recover any Cash deposits held on account of such contracts upon assumption. Conversely, the Liquidation Analysis assumes that the applicable counterparties, each respective first lien holders, will request the proceeds of cash held in such account pursuant to Assignment of Rents clause(s) in each respective Deed of Trust. Therefore, it is assumed that such Cash is not recoverable. In addition, other than the reference to potential preference recoveries referred to above, the Liquidation Analysis does not assume any recoveries for any other avoidance actions.

### Liquidation Costs

#### Wind-Down Costs

It is estimated there would be approximately $109,500 of assets to distribute to creditors with a remainder owed to the debtors, the Chapter 7 Trustee would collect its 10%

fee, engage real estate and other professionals to effectuate the sale of the respective properties (described above), and file a Report of Distribution with each secured creditor (except for Charter Oak and the Glendale Building) paid in full and each unsecured creditor being paid in full with a remainder to be allocated back to the Debtors.

Otherwise, wind-down costs could consist of the regularly occurring general and administrative costs required to make the appropriate filings with governmental entities during the liquidation process, and the costs of any professionals the Trustee employs to assist with the liquidation process, including attorneys, accountants and other advisors.

### Trustee Fees

Section 326 of the Bankruptcy Code provides for reasonable compensation for the Trustee's rendered services. As stated above, the Debtors estimate that liquidation of the Estate will yield $55,363.59 for unsecured creditors and, therefore, $5,536.36 to the Chapter 7 Trustee. All secured creditors would exercise their remedies under their respective liens or be paid in full upon sale of each respective property.

### Claims

#### DIP Claims

There are no DIP Claims. Moneys held in the DIP account is money collected from rent proceeds and will likely be claimed by the first lien holders pursuant the Assignment of Rents clause contained in their respective deeds of trust upon liquidation. Any additional monies in the DIP account would come from Roland Silver's Home Depot employment which would be below the Chapter 7 exemption amount or would be social security payments which are also exempt.

#### Administrative and Priority Claims

Administrative and Priority Claims consist of: (a) Claims entitled to administrative expense priority under section 503 of the Bankruptcy Code and (c) Claims entitled to priority under section 507 of the Bankruptcy Code. Because the Debtor's post-petition payables primarily relate to the rental operation of its properties, the Liquidation Analysis assumes that such payables will be paid in the ordinary course by the respective senior lien holders.

Claims arising from the post-conversion rejection of contracts that were assumed during the Chapter 11 Case or entered into post-petition are also included in this category.

**First -Lien Debt**

Secured Claims consists of the holders of each respective first position Deed of Trust as described above.

The Liquidation Analysis assumes that Allowed First Lien Debt Claims would be a fully secured claim pursuant to section 506(a) and (d). After abandonment by the Trustee of the Glendale Building the First Lien Debt Claim would be properly satisfied in a foreclosure proceeding (the First Lien Holder would not be liable for tax penalties as the Debtors would), pursuant to A.R.S. Section 33-801 et.seq. The Charter Oak Home would be abandoned and would continue to receive its monthly installment payments. The Hatcher Building and Acoma Condos would be paid in full through the sale of each respective property.

Thus, all secured claims would be satisfied in full.

**Unsecured Claims**

The Liquidation Analysis assumes that the Trustee would distribute any Liquidation Proceeds to unsecured claimants, paying each in full.

**Interests**

There would be a surplus of funds and Debtors would receive $86,390.05 after all claims are fully administered.

**E.** **Conclusion**

The Debtors intend to continue their operations in a manner consistent with their Plan to continue to generate monthly revenue income with the Hatcher Building and Acoma Condos being "break-even" against the monthly secured installment payments until the Hatcher Building and Acoma Condos are sold. Debtors will sell Charter Oak and become tenants at a different location that is cheaper than the monthly installment payment at Charter Oak thus preserving financial resources. Debtors will continue to manage the Glendale building with a profit of approximately $6,500 per month, and with the expectation of additional future profit in the amounts of an additional approximately $3,300 for the

vacant space in the Glendale The circumstances that so negatively affected the Debtors and caused them to seek protection under Chapter 11 of the Bankruptcy Code were not of their own making, but were the byproduct of a hostile tenant in their most valuable rental space who replaced a tenant of over 20 years. The Glendale Building, either through rental income or an ultimate sale, is their only shot at having retirement money. At the same time the community will benefit from the continued operations of Debtors' continued operations because Maricopa County only recently recovered from the foreclosure crisis and the community at large will benefit if the Debtors are able to avoid more foreclosures in the area and, over time, help to appreciate the real estate market by selling the Hatcher Building and Acoma Condos for negotiated fair market prices. Thus, the Debtors believe the Plan is in the best interest of all creditors as the Plan is fully funded and will yield a more positive impact on the community than if the case were converted to a Chapter 7

## V. DEBTORS' REVENUE FLOW

The Revenue and Expense Flow estimates potential Cash accumulated, distributed to Holders of Allowed Claims and Interests for the Debtor's Chapter 11 Plan. The cash accumulated is derived from current rental income from Debtors' Glendale Building tenants (Acoma Condo and Hatcher Building tenants are about "break even" and the Plan requires liquidation of these assets), in the cumulative amount of $15,078.00, with an expected increase to $18,856.25 when the Glendale Building is 100% occupied. Other current rents are: 1) $0 for Charter Oak; 2) $0 for Unit 1040; 3) $2,430 for the Hatcher Building; 4) $950 for Unit 2093; and, 5) $945 for Unit 1052. Distributions to the First Secured Lien Holders, post-petition are: 1) $8,932.86 for the Glendale Building; 2) $884.82 to Unit 1040; 3) $4,460.12 to Charter Oak; 4) $904.69 to Unit 1052; 5) $893.13 to Unit 2093; and, 6) $2,522.

to the Hatcher Building. This leaves a net balance of $805.38 per month.[4]  Post-petition property taxes are paid by the secured creditors through impound accounts.[5]

Based upon a review of Claims listed on the Debtors' Schedules and Proofs of Claim filed to date, arrearages to be paid over the life of the Plan are approximately $55,493.10 for the Glendale Building; $938.35 in priority taxes; $12,850 in priority wages; and, $42,513.59 in non-priority unsecured.

## VI.	SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.	Administrative Proceedings

The Debtors filed their Petition for Relief under Chapter 11 on July 5, 2017, and a first meeting of creditors was held on August 15, 2017.

### B.	Retention of Professionals

The Debtors retained the Law Offices Kyle A. Kinney, PLLC (the "Kinney Firm") to act as its bankruptcy counsel. The Court has signed an Order approving the retention of the Kinney Firm as of this date to be effective as of the Petition Date.  The Debtors retained attorney Cynthia L. Johnson (the "Johnson Firm") to act as its special counsel for the limited purpose of evicting a tenant from Unit 1040 in the Scottsdale City Court. The Court signed an Order approving the retention of the Johnson Firm and the Johnson Firm's representation has concluded.  The Debtors retained CPA Joel Ruben to assist them in the preparation of their monthly operating report, tax and other financial matters.  An application for the employment and retention of Joel Ruben remains pending but Debtors anticipate the Application to be granted.  They Court approved the retention of real estate sales person Clayton Breeden to act as the Silver's real estate sales person to sell the Acoma Condos. Debtors anticipate retaining Mr. Breeden to sell Charter Oak. Finally, Debtors anticipate hiring a to be determined real estate sales person or brokerage with experience in commercial

---

[4] Unit 1040 is in escrow with a pending close date of June 16, 2018. Assuming escrow closes, there will not be any further post-petition payments made for Unit 1040.

[5] For the Glendale Building, loan servicer Ocwen has allowed property taxes to go delinquent but it is assumed that those will be paid when Ocwen accepts Debtors' monthly installment payments as required.

real estate to sell the Hatcher Building.

### C. Appointment of Unsecured Creditors Committee

The United States Trustee's Office filed a statement stating that, despite its efforts to contact unsecured creditors, it was unable to appoint a Committee of Unsecured Creditors.

### D. Setting of Claims Bar Date

The Court has not set a bar date for the filing of claims in this case.

### E. Operating Reports

The Debtor's monthly operating reports are current and copies can be obtained from the Court's electronic docket.

### F. Stay Relief Motion

To date, Ocwen has filed a Stay Relief Motion for the Glendale Building. Debtors have opposed the Motion and a hearing is set for Tuesday, June 19, 2018 at 2 p.m.

### G. Plan of Reorganization

Together with this Disclosure, Debtors have filed its First Amended Plan of Reorganization.

## VII. DESCRIPTION OF ASSETS AND LIABILITIES OF THE DEBTORS

### A. Assets

The values ascribed to the Debtors' assets below are based on the Debtors' best estimate and other factors such as the purchase price, comparable sales, and tax assessments.

1. Real Estate – To be determined by this Court at the Confirmation hearing.

2. Bank Accounts – Wells Fargo (D.I.P. Account) – 63,775.45 as of June 1, 2018 Disclosure Statement.

**3. Lease-holds:**

a. Glendale Building Lease 1: $13,132.00 per month.

b. Glendale Building Lease 2: $1,948.18

      c.      Hatcher Building Lease 1: $750

      d.      Hatcher Building Lease 2: $500

      e.      Hatcher Building Lease 3: $500

      f.      Hatcher Building Lease 4: $680

      g.      Unit 1052 Lease: $945

      h.      Unit 2093 Lease: $950

**B.**    **Liabilities**

The following is an overview of the Debtors' known liabilities/schedule of claims.

      **1.**     **Administrative Claims**

      a.      Class 1-A consists of Allowed Priority Claims under 11 U.S.C. § 503 and § 507(a)(2) – administrative priority claims. The estimated amounts owed are as follows: 1) $23,500.00 to the Kinney Firm; $12,000.00 to Joel Reuben; $500.00 to Cynthia L. Johnson, P.C. Clayton Breeden's claim has not yet been realized as Unit 1040 has not closed escrow.

      b.      Class 1-B consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(4) – commission claims. It is believed the sole Claimant in this class, Rein & Grossoehme, will agree to be paid, in full, in cash, in equal monthly installments over a six month period with the first payment to be made on the Effective Date. The total claim according to the proof of claim is $12,850.00.

      c.      Class 1-C consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8) – tax Claims which are not otherwise treated as secured claims herein. The sole claimant in this class is the Arizona Department of Revenue and, according to the proof of claim, the total amount is $938.35.

2. **Secured Claims**

    a.    Class 1-A consists of a Secured Claim under 11 U.S.C. §506(a) of which Debtor's schedules reflects US bank via Ocwen as the secured creditor with a first position lien deed of trust on the Glendale Building. The debt associated with this claim, according to the proof of claim is $1,151,926.50.

    b.    Class 1-B consists of a Secured Claim under 11 U.S.C. §506(a) of which Debtor's schedules reflects US bank via Nationstar as the secured creditor with a first position lien deed of trust on the Unit 1040. The debt associated with this claim, according to the proof of claim is $136.931.07.

    c.    Class 1-C consists of a Secured Claim under 11 U.S.C. §506(a) of which Debtor's schedules reflects Deutsche via Ocwen as the secured creditor with a first position lien deed of trust on Charter Oak. The debt associated with this claim, according to the proof of claim is $934,310.07.

    d.    Class 1-D consists of a Secured Claim under 11 U.S.C. §506(a) of which Debtor's schedules reflects Wells Fargo via Ocwen as the secured creditor with a first position lien deed of trust on Unit 1052. The debt associated with this claim, according to the proof of claim is $136,573.35.

    e.    Class 1-E consists of a Secured Claim under 11 U.S.C. §506(a) of which Debtor's schedules reflects Wells Fargo via Ocwen as the secured creditor with a first position lien deed of trust on Unit 2093. The debt associated with this claim, according to the proof of claim is $136,696.05.

    f.    Class 1-F consists of a Secured Claim under 11 U.S.C. §506(a) of which Debtor's schedules reflects Greenpoint Mortgage

Funding, Inc. via Capital One as the secured creditor with a first position lien deed of trust on the Hatcher Building. The debt associated with this claim, according to the proof of claim is $267,511.59.

g.    Class 1-G consists of a Secured Claim under 11 U.S.C. §506(a) of which Debtor's schedules list Nissan-Infiniti LT as the secured creditor with a lien on the 2017 Rogue vehicle. The debt associated with this claim, according to the proof of claim, is $16,350.94.

3.    **Unsecured Claims**

a.     According to the proofs of claim, the following are the unsecured creditors that will be paid, in full, through the plan:

i.     Nissan - $2,376;

ii.     Discover Bank - $790.18

iii.     Arizona Department of Revenue - $80.02

iv.     Wells Fargo Bank, NA - $3,797.70

v.     American Express Bank, FSB - $690.28

vi.     American Express Bank, FSB - $3,005.04

vii.     Compass Bank - $1,283.37

viii.     Rein & Grossoehme - $15,904.89

ix.     Synchrony Bank - $1,660.52

x.     Synchrony Bank - $5,078.83

xi.     Comenity Capital Bank/Paypal Credit - $1,834.05

xii.     Wells Fargo Bank, NA - $8,388.71[6]

C.    **Administrative Expenses**

The Debtors' administrative expenses consist of the fees and costs of attorneys and

---

[6] The actual amount of SWBFC's unsecured claim, for purposes of plan treatment, is $32,099.53.

other professionals necessary to the Debtors' operations, bankruptcy cases, and plan of reorganization. The fees and costs of these professionals will not be precisely known until the Bankruptcy Case is completed. However, as set forth below, the Debtors' professionals anticipate that either (a) the retainers they presently have will be insufficient to cover the services they have rendered, and will render, in the Bankruptcy Case, or (b) for those professionals that do not have retainers and will be paid by some other manner, their projected anticipated fees and costs for their services will be commensurate with their historical fees and costs incurred by the Debtors.

The Debtors' current bankruptcy counsel is the Kinney Firm. Prior to filing the petition, the Kinney Firm, respectively took possession of a retainer in the amount of $24,395.00, of which $12,800.00 was billed pre-petition and $1,717.00 was used to pay for this Chapter 11 filing fee, leaving a balance of $9,878.00. The Kinney Firm anticipates its fees for services already rendered and continued work will total approximately $20,000.

CPA Joel Reuben did not receive a pre-petition retainer. Mr. Reuben estimates that he has rendered approximately $10,000.00 of services to date, and anticipates an additional $2,000.00 of ongoing services.

The Law Office of Cynthia L. Johnson, P.C. estimates that that she has rendered approximately $500.00 in services pertaining to the eviction action.

Real estate sales person Clayton Breeden has agreed to sell the Acoma Condos for a 2.5% commission on the total sales price. Mr. Breeden anticipates that amount to be $4,675 for Unit 1040 and anticipates a similar amount for Unit 1052 and Unit 2093.

## VIII.  PLAN SUMMARY

The following statements concerning the Plan are merely a summary of the Plan and are not complete. The statements are qualified entirely by express reference to the Plan. Creditors are urged to consult with counsel or each other in order to understand the Plan fully. The Plan is complete, inasmuch as it proposes a legally binding agreement by the Debtors, and an intelligent judgment cannot be made without reading it in full. Most of the creditors of the Debtors are impaired under the terms of this Plan.  One Secured Creditor is impaired

because they will be subjected to different treatment than they had originally contracted for with the Debtor. The sole wage/commission claim is impaired. The Unsecured Creditors will be impaired because they will be subject to different treatment than they originally contracted for. Thus, the Debtors will have numerous classes with the right to vote on their Plan of reorganization, as set forth herein.

## IX.    TREATMENT OF CLASSES.

### A.    Class 1: Priority Claims

#### 1.    Class 1-A: Administrative Claims

This Class consists of Allowed Priority Claims under 11 U.S.C. § 503 and § 507(a)(2) – administrative priority claims. Unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Claims of Class 1-A shall be paid in full, in cash, on or before the Effective Date or as the same are Allowed and ordered paid by the Court. Any Class 1-A Claim not allowed as of the Effective Date shall be paid as soon thereafter as it is allowed by the Court according to the terms of this Class. This class is not impaired.

#### 2.    Class 1-B: Commission Claims

This Class 1-B consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(4) – commission claims. As provided in 11 U.S.C. § 1129(a)(9)(B), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-B shall be paid in full, in cash, on or before the Effective Date. It is believed the sole Claimant, Rein & Grossoehme, in this class will agree to be paid, in full, in cash, in equal monthly installments over a six month period with the first payment to be made on the Effective Date. The total amount of the claim is $12,850.00. Any Class 1-B Claim not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class. This class is impaired.

#### 3.    Class 1-C: Tax Claims

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8) –

tax Claims which are not otherwise treated as secured claims herein. The sole claimant in this class is the Arizona Department of Revenue for the amount of $938.35. As provided in 11 U.S.C. § 1129(a)(9)(C), unless Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-C shall be paid in full, in cash, on or before the Effective Date, or, at the Debtor's option, such Allowed Claims shall be paid, on account of such Allowed Claim, deferred cash payments, over a period not exceeding seven years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim. Any Class 1-¬C Claims not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class. This class is not impaired.

**B.  Class 2: Secured Claims**

> **1.  Class 2-A – Allowed Secured Claims of US Bank via Ocwen for the Glendale Building**

This Class consists of the Allowed Secured Claim of US Bank via Ocwen for the Glendale Building $1,151,926.50. As set forth herein, this is an impaired class. The Allowed Secured Claim arises out of an interest only promissory note with a balloon payment due on the May 1, 2022 maturity date. The pre-petition deficiencies as stated in US Bank's Proof of Claim shall be added to the principal balance of the note. US Bank shall apply the approximately $50,000 held in suspense toward the principal balance, if not already applied. US Bank shall have an allowed secured claim for this amount. The Debtor will make interest only post-petition monthly installment payments to US Bank via Ocwen (based upon the new principal balance calculated by adding the pre-petition arrears stated in the Proof of Claim to the principal balance) and a balloon payment on the full principal amount no later than May 1, 2022 in full, as stated in the note. The first interest only payment shall be made on the Effective Date with monthly payments made thereafter until the maturity date. The interest rate shall be the interest rate set-forth in the promissory note. There shall be no pre-payment

penalty for pre-payments of principal. Payments shall be applied first to interest, then to principal of the Allowed Secured Claim, and then to the un-matured principal. Debtor shall continue to make all post-petition payments through the maturity date or until paid in full.

### 2. Class 2-B – Allowed Secured Claims of US Bank via Nationstar for Unit 1040

This Class consists of the Allowed Secured Claim of US Bank via Nationstar for Unit 1040 in the amount of $136,931.07. As set forth herein, this is an impaired class. The Allowed Secured Claim arises out of an installment payment due July 1, 2017 under a promissory note. It is believed that the installment payment was made as a post-petition payment for July, 2017 (within the grace period allowed under the terms of the promissory note) and that the arrearage is satisfied. To the extent that the arrearage is not satisfied, the Debtor will pay the claim, in full, within 90 days of the Effective Date with interest at the rate as set-forth in the promissory note. Debtor shall continue to make all post-petition installment payments through the maturity date or until paid in full.

### 3. Class 2-C – Allowed Secured Claims of Deutsche via Ocwen for Charter Oak

This Class consists of the Allowed Secured Claim of Deutsche via Ocwen for Charter Oak in the amount of $934,310.07. As set forth herein, this is an impaired class. The Allowed Secured Claim arises out of missed installment payments due under a modified promissory note. The Debtors will liquidate Charter Oak as soon as practicable, but in any event no later than 12 months from the Effective Date provided that Debtors receive an offer that will satisfy the Allowed Secured Claim, in full, or Deutsche accepts an amount less than the Allowed Secured Claim in the form of a short sale. In the event that Debtors cannot liquidate Charter Oak within 12 months of the Effective Date, Debtors will pay the pre-petition arrearages, in full, within 13 months of the Effective Date or surrender Charter Oak thus allowing Deutsche to enforce its non-judicial foreclosure rights. The interest rate shall be the interest rate

set-forth in the promissory note. There shall be no pre-payment penalty. Debtor shall continue to make post-petition installment payments as they become due under the promissory note. The Allowed Secured Claim shall be paid, in full, at the earlier of: 1) the close of escrow; or, 2) the note maturity date.

### 4. **Class 2-D – Allowed Secured Claims of Wells Fargo via Ocwen for Unit 1052**

This Class consists of the Allowed Secured Claim of Wells Fargo via Ocwen for Unit 1052, in the amount of $136,573.35. As set forth herein, this is an impaired class. The Allowed Secured Claim arises out of an installment payment due July 1, 2017 under a promissory note. It is believed that the installment payment was made as a post-petition payment for July, 2017 (within the grace period allowed under the terms of the promissory note) and that the arrearage is satisfied. Debtors will liquidate Unit 1052 as soon as practicable, with the Allowed Secured Claim to be paid, in full, upon the close of escrow. Debtor shall continue to make all future post-petition installment payments as they become due under the promissory note through the earlier of: 1) sale of Unit 1052; or, 2) the note maturity date.

### 5. **Class 2-E – Allowed Secured Claims of Wells Fargo via Ocwen for Unit 2093**

This Class consists of the Allowed Secured Claim of Wells Fargo via Ocwen for Unit 2093, in the amount of $136,696.05. As set forth herein, this is an impaired class. The Allowed Secured Claim arises out of an installment payment due July 1, 2017 under a promissory note. It is believed that the installment payment was made as a post-petition payment for July, 2017 (within the grace period allowed under the terms of the promissory note) and that the arrearage is satisfied. Debtors will liquidate Unit 2093 as soon as practicable, with the Allowed Secured Claim to be paid, in full, upon the close of escrow. Debtor shall continue to make all future post-petition installment payments as they become due under the promissory note through the earlier of: 1) sale of Unit 2093; or, 2) the note maturity date.

### 6. Class 2-F – Allowed Secured Claims of Greenpoint Mortgage Funding, Inc. via Capital One for the Hatcher Building

This Class consists of the Allowed Secured Claim of Greenpoint Mortgage Funding, Inc. via Capital One for the Hatcher Building, in the amount of $267,511.59. As set forth herein, this is not an impaired class. There is no pre-petition arrearage. The terms of the subject promissory note secured by a deed of trust will remain unchanged and Debtors shall continue to make all post-petition installment payments. Debtors will liquidate the Hatcher Building as soon as practicable and the Allowed Secured Claim shall be paid, in full, at the earlier of: 1) the close of escrow; or, 2) the note maturity date.

### 7. Class 2-G – Allowed Secured Claims of Nissan-Infiniti LT for 2017 Rogue

This Class consists of the Allowed Secured Claim of Nissan-Infiniti LT for a 2017 Rogue vehicle, in the amount of $16,350.94. As set forth herein, this is not an impaired class. The Allowed Secured Claim arises out of a vehicle lease. There was not an arrearage as of the petition date. Debtor reaffirms the terms of the lease agreement.

## C. Class 3: Unsecured Claims

### 1. Class 3-A: Allowed Unsecured Claim of RGCRE

This Class consists of the Allowed Unsecured Claim of RGCRE which shall be equal to the difference between RGCRE's total claim and the amount paid in Class 1-B above, for a total amount of $15,904.89 within 36 months of the Effective Date.

### 2. Class 3-B: Allowed Unsecured Claims of Creditor Nissan-Infiniti LT for 2014 Sentra

This class consists of the Allowed Unsecured Claim of Nissan-Infiniti LT for that certain 2014 Sentra, in the amount of $2,376.00. This claim was filed as a secured claim, however, the 2014 Sentra was abandoned by the Debtors and surrendered to the creditor. Thus, the claim shall be treated as an unsecured claim and paid within 36 months of the Effective Date.

### 3. <u>Treatment of Classes 3-A, 3-B and 3-C Under This Plan</u>

Notwithstanding the fact that Class 3-A and Class 3-B are distinctly identified in this Plan as separate classes, for the purposes of this Plan, Class 3-A, Class 3-B and Class 3-C (collectively, "Class 3") are treated the same under the Plan. All secured creditors and the amounts due to them each, respectively, as listed in Section VII above shall be paid, in full, within 36 months of the Effective Date.

The unsecured creditors shall be paid a pro rata share of the following amounts, notwithstanding the necessary withholdings for the Debtors' ordinary course of business: the liquidation value of the Acoma Condos, Charter Oak and the Hatcher Building (calculated by the sales price minus: 1) each respective Allowed Secured Claim; 2) any outstanding property taxes; 3) real estate commission fees; 4) closing costs; and, 5) other costs of liquidation); any balances to be paid through the excess rental revenues acquired from the leases on the Glendale Building but in no event later than 36 months from the Effective Date.

### D. <u>Class 4: Interest Holders</u>

The Interest Holders in the Debtor will retain their interests in consideration of the New Value they contribute to the Reorganized Debtor pursuant to this Plan. The amount of the New Value will consist of (a) the amount necessary to pay all Class 1 Allowed Priority Claims as set forth above; (b) the amount necessary to fund the Interest Reserve Account as required by the treatment of Class 2-A and Class 2-B Claimants, above; and (c) the Unsecured Distribution Amount.

# X. MEANS FOR EXECUTING THE PLAN.

## A. <u>Liquidation and Property Management</u>

The Plan will be executed through the liquidation of the Acoma Condos, the Hatcher Building and Charter Oak. The liquidation of these 5 properties will provide sufficient funds to pay off the administrative expenses, a good chunk of the unsecured creditors, each respective lien holder, and allow the Debtors enough financial flexibility to lead a modest life. Liquidation of Charter Oak will allow the Debtors to reduce their personal living expenses nearly in half. The Plan will also be executed by continuing to lease the Glendale Building. Arlene Silver shall continue to manage the Glendale Building and will receive assistance from the Debtors' son, Scott Silver for necessary repairs or manual labor associated with the management of the Glendale Building. The Reorganized Debtors will attempt to the one vacant end cap space in the Glendale Building to a new tenant (or tenants) to help make the payments required by the Plan.

Debtors are currently finalizing repairs to damages caused by a former tenant that will make this end cap space marketable once again. Debtors are hopeful that when the Debtors' Plan is confirmed, that these concerns will be alleviated. Currently, the Glendale Building produces revenue approximately $5,000.00 over total cost (installment payments and maintenance). Once the end cap space is leased, this figure will jump to nearly $9,000.00 and will allow the Debtors to aggressively pay down the pre-petition arrearages owed to the lien holder.

## B. <u>Application of Post-Petition Payments</u>

Debtor's payments shall be made in absolute priority on the day they are received and are to post and apply on the same day to: First, principal; Second, interest; and Third, servicer fees. No payments shall be held in any suspense account. Any missed payments shall be applied correctly, not held in any suspense account. Any corporate advances shall be such as property taxes, attorney's fees, proofs of claim, BPO's or appraisals costs or forced place insurance shall be paid last.

### C.     <u>Invalid Liens</u>

Any priority liens or liens of any sort found to be invalid or without authority, Debtors reserve the right to dispute in adversary proceedings, by motion or otherwise. Debtors believe that the lien imposed by the City of Mesa is invalid and without authority.

### D.     <u>Liquidation of Estate Property</u>

The Debtors shall have the authority to retain such brokers, agents, counsel, or representatives as it deems necessary to liquidate assets of the Reorganized Debtor.

### E.     <u>Management</u>

The Plan will be implemented by the retention of its existing management. The current interest holder will maintain current business operations as set forth above and in accordance with the terms of this Plan.

### F.     <u>Disbursing Agent</u>

The Reorganized Debtors shall act as the Disbursing Agent under the Plan.

### G.     <u>Documentation of Plan Implementation</u>

In the event any entity which possesses an Allowed Secured Claim or any other lien in any of the Debtor's property for which the Plan requires the execution of any documents to incorporate the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, the Debtors may record a copy of this Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtors deem advisable, it may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

## XI.     EFFECT OF CONFIRMATION.

Except as otherwise provided in the Plan or the Confirmation Order, Confirmation acts as a Discharge, effective as of Confirmation, of any and all debts of the Debtors that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to § 1141(d)(1) of the Bankruptcy Code. The

Discharge shall be effective as to each Claim, regardless of whether a Proof of Claim thereon was filed, whether the Claim is an Allowed Claim, or whether the Holder thereof votes to accept the Plan.

In addition, any pre-confirmation obligations of the Debtors dealt with in this Plan shall be considered New Obligations of the Debtor, and these New Obligations shall not be considered in default unless and until the Reorganized Debtors defaults on the New Obligations pursuant to the terms of the Plan. The New Obligations provided for in the Plan shall be in the place of, and completely substitute for, any pre-Confirmation obligations of the Debtor. Once the Plan is confirmed, the only obligations of the Debtors shall be such New Obligations as provided for under the Plan.

## XII.     OBJECTIONS TO AND ESTIMATIONS OF CLAIMS.

### A.     <u>Objections and Bar Date for Filing Objections.</u>

As soon as practicable, but in no event later than 120 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made pursuant to the Bankruptcy Code and the Bankruptcy Rules. Objections filed after such date will be barred.

### B.     <u>Settlement of Claims.</u>

Settlement of any objection to a Claim not exceeding $10,000 shall be permitted on the eleventh (11th) day after notice of the settlement has been provided to the Debtor, the Creditors, the settling party, and other persons specifically requesting such notice, and if on such date there is no written objection filed, such settlement shall be deemed approved. In the event of a written objection to the settlement, the settlement must be approved by the Court on notice to the objecting party.

### C.     <u>Estimation of Claims</u>

For purposes of making distributions provided for under the Plan, all Claims objected to shall be estimated by the Disbursing Agent at an amount equal to (i) the amount, if any, determined by the Court pursuant to § 502(c) of the Bankruptcy Code as an estimate for distribution purposes; (ii) an amount agreed to between the Debtors and the Claimant; or, (iii)

that amount set forth as an estimate in the Plan or Disclosure Statement. Notwithstanding anything herein to the contrary, no distributions shall be made on account of any Claim until such Claim is an Allowed Claim.

### D. **Unclaimed Funds and Interest.**

Distribution to Claimants shall be mailed by the Reorganized Debtors to the Claimants at the address appearing on the master mailing matrix unless the Claimant provides the Reorganized Debtors with an alternative address. For a period of one (1) year from the date that a distribution was to be made by the disbursing agent but has gone uncollected by the Claimant, the disbursing agent shall retain any distributions otherwise distributable hereunder which remain unclaimed or as to which the disbursing agent has not received documents required pursuant to the Plan. Thereafter, the unclaimed funds shall be deposited in the appropriate distribution account for distribution to other Claimants entitled to participate in such respective fund.

## XIII. NON-ALLOWANCE OF PENALTIES AND FINES.

No distribution shall be made under this Plan on account of, and no Allowed Claim, whether Secured, Unsecured, Administrative, or Priority, shall include any fine, penalty, exemplary or punitive damages, late charges, default interest or other monetary charges relating to or arising from any default or breach by the Debtor, and any Claim on account thereof shall be deemed Disallowed, whether or not an objection was filed to it.

## XIV. CLOSING OF CASE.

Until these cases are officially closed, the Reorganized Debtors will be responsible for filing pre-and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee, in cash, pursuant to 28 U.S.C. § 1930, as amended. Pursuant to 11 U.S.C. § 1129(a)(12), all fees payable under Section 1930 of Title 28, as determined by the Court at the hearing on confirmation of the Plan, will be paid, in cash, on the Effective Date.

## XV. MODIFICATION OF THE PLAN.

In addition to its modification rights under Section 1127 of the Bankruptcy Code, the

Debtors may amend or modify this Plan at any time prior to Confirmation without leave of the Court. The Debtors may propose amendments and/or modifications of this Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors. After Confirmation of the Plan, the Debtors may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of this Plan.

## XVI. JURISDICTION OF THE COURT.

The Court will retain jurisdiction until this Plan has been fully consummated for, including but not limited to, the following purposes:

1. The classification of the Claims of any Creditors and the re-examination of any Claims which have been allowed for the purposes of voting, and for the determination of such objections as may be filed to the Creditor's Claims. The failure by the Debtors to object to or examine any Claim for the purpose of voting shall not be deemed to be a waiver of the Debtor's rights to object to or to re-examine the Claim in whole or in part.

2. To determine any Claims which are disputed by the Debtor, whether such objections are filed before or after Confirmation, to estimate any Un-liquidated or Contingent Claims pursuant to 11 U.S.C. § 502(c)(1) upon request of the Debtors or any holder of a Contingent or Un-liquidated Claim, and to make determination on any objection to such Claim.

3. To determine all questions and disputes regarding title to the assets of the Estate, and determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of Confirmation, between the Debtors and any other party, including but not limited to, any rights of the Debtors to recover assets pursuant to the provisions of the Bankruptcy Code.

4. The correction of any defect, the curing of any omission or any reconciliation of any inconsistencies in this Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of this Plan.

5.     The modification of this Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code.

6.     To enforce and interpret the terms and conditions of this Plan.

7.     The entry of an order, including injunctions, necessary to enforce the title, rights and powers of the Debtor, and to impose such limitations, restrictions, terms and conditions of such title, right and power that this Court may deem necessary.

8.     The entry of an order concluding and terminating this case.

## XVII. RETENTION AND ENFORCEMENT OF CLAIMS.

Pursuant to § 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any and all claims of the Debtor, except those claims specifically waived herein. Any retained causes of action include, but are not limited to, all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Effective Date which have not been resolved or disposed of prior to the Effective Date, whether or not such claims or causes of action are specifically identified in the Disclosure Statement.

Any recovery obtained from retained causes of action shall become an additional asset of the Debtor, unless otherwise ordered by the Court, and shall be available for distribution in accordance with the terms of this Plan.

## XVIII.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

Every contract not assumed specifically by this Plan is hereby rejected. Upon confirmation the month to month leas will expire and there will be no executory contracts and/or leases the Debtors intend to assume.

Claims under § 502(g) of the Code arising as a result of the rejection of executory contracts or unexpired leases shall be filed no later than 30 days after the Confirmation Date. Any such Claims not timely filed and served shall be disallowed.

## XIX. REVESTING.

Except as provided for in the Plan or in the Confirmation Order, on the Effective Date the Reorganized Debtors shall be vested with all the property of the Estate free and clear of

1  all claims, liens, charges, and other interests of Creditors, arising prior to the Effective Date.

2  Upon the Effective Date, the Reorganized Debtors shall operate their business free of any

3  restrictions.

4          Dated August 6, 2018

5                                          **LAW OFFICES OF KYLE A. KINNEY, PLLC**

6

7                                          By: */s/Kyle A. Kinney*_____
                                                Kyle Kinney Bar No. 027189
8                                               Attorney for Debtors

9

10

This is to certify that the foregoing was
11  e-filed on this 6th day of August, 2018,
in the United States Bankruptcy Court,
12  COPY of the foregoing served via electronic
Notification that same date on:
13

14  Office of the U.S. Trustee
230 North First Avenue, Suite 204
15  Phoenix, AZ 85003-1706                      Lori L. Winkelman
                                                Amelia B. Valenzuela
16  RENEE SANDLER SHAMBLIN                      Quarles & Brady LLP
Office of the U. S. Trustee                     Renaissance One
17  230 North First Avenue, Suite 204           Two North Central Avenue
Phoenix, AZ 85003-1706                          Phoenix, Arizona 85004-2391
18                                              lori.winkelman@quarles.com
19  Kim Lepore                                  amelia.valenzuela@quarles.com
klepore@wrightlegal.net                         *Attorneys for Capital One, NA as servicer*
20  Jamin S. Neil (SBN 026655)                  *forGreenpoint Mortgage Funding, Inc.*
jneil@wrightlegal.net
21  WRIGHT, FINLAY & ZAK, LLP                   Joseph J. Tirello, Jr., Esq.
22  16427 N. Scottsdale Road, Suite 300         **ZIEVE, BRODNAX & STEELE, LLP**
Scottsdale, Arizona 85254                       3550 North Central Avenue, Suite 625
23  *Attorneys for Nissan*                      Phoenix, AZ 85012
                                                E-mail: Jtirello@zbslaw.com
24  ALDRIDGE PITE, LLP                          *Attorneys for U.S. Bank National Association,*
ecfazb@aldridgepite.com                         *as Trustee for Lehman Brothers Small*
25  4375 Jutland Drive, Suite 200               *Balance*
P.O. Box 17933                                  *Commercial Mortgage Pass-Through*
26  San Diego, CA 92177-0933                    *Certificates,*
27  *Attorneys for Ocwen Loan Servicing*        *Series 200*

28  By:____Paula D. Hillock_____

37